## In re Marriage Licenses

ROSENFIELD, P. J., March 21, 1949.—This matter comes before the court upon certificate of the clerk of the orphans' court under the terms of the Act of July 24, 1913, P. L. 1013, sec. 4, 48 PS §16. The certificate sets forth the following:

"From my personal knowledge and from facts I have ascertained, I am of the opinion that license should not issue because of the weak-mindedness of the said (male applicant) and his inability to support a family."

The clerk cites as his authority for the refusal of this license section 3 of the same act, 48 PS §15:

"No license to marry shall be issued where either of the contracting parties is an imbecile, epileptic, of unsound mind, or under guardianship as a person of unsound mind; nor to any male person who is or has been within five years, an inmate of any county asylum or home for indigent persons, unless it satisfactorily appears that the cause of such condition has been removed, and that such male applicant is physically able to support a family; or if, at the time of making application, either of the contracting parties is under the influence of an intoxicating liquor or narcotic drug; and no license shall be valid for a longer period than 60 days from the date of issue."

Upon receipt of the certificate of the clerk we fixed a time for hearing petitioners and the clerk. The testimony shows that the male applicant is 43 years of age, and is a laborer whose education stopped at the fifth grade. His worldly wealth consists of approximately $50. At present he is in good health and employed. One year ago he was on relief. He has never been in any county asylum or home for indigent persons. He has never been examined to determine whether he is epileptic. He is not of unsound mind.

At the instance of the court, the parties submitted to an examination by Dr. Irving Chatterton, clinical psychologist, to determine whether they could be classified as imbeciles, and hence, not qualified to receive a license. Dr. Chatterton, registered psychologist, a graduate of New York University with a doctor's degree, namely, Ed.D., testified that the male applicant is not an imbecile but that he belongs in the next higher classification. We are advised that the next classification is that of moron. Though the clerk is forbidden to issue a license to an imbecile, there is no prohibition in the statute against issuing a license to a moron.

It is contended that the children of this couple, if any, will be entitled to a better birthright than they will receive. Cogent as this argument may be, it concerns policy, not the law as it is written, and should be directed to the legislature, which has not prohibited the grant of a marriage license to a moron. The legislature prohibited the issuing of a license to an imbecile and did not prohibit the issuing of such a license to a moron.

The second reason for the clerk's refusal to issue a license was male applicant's "inability to support a family". When interrogated as to his income, applicant testified that he was "just working by the day, don't get too much right now". He could not state that he had done any work during the week when the application was made and said that he did not work during the previous week. The week before that he worked two hours, and the week before that he worked about 10 hours. His testimony shows that his compensation was 50 cents an hour. He admits that he was on relief in June 1948. Since the female applicant is of the same mental caliber as the male applicant, and is 22 years of age, the clerk very rightly concludes that the marriage will be apt to result in the production of a family which will always be a burden to the taxpayers. He

calls attention to the tremendous cost of various forms of assistance in this county.

Since the hearing in this matter and before this memorandum opinion was written, our attention was called to a pamphlet issued by the Department of Public Assistance of the Commonwealth of Pennsylvania wherein there appears a map which shows that in this county assistance in one form or another is given to 6.1 percent of its population, and to a news article emanating from Harrisburg and quoting the State treasurer as saying that "Bradford County residents in the groups receiving special assistance were paid a total of $76,463.20 in February divided as follows: Aged, $42,134.60; blind, $5,595.20; aid to dependent children, $28,733.40. January payments here totaled $76,048.20".

The total expenditures for various types of assistance, including the above-mentioned items, the cost of the child welfare services, and the operation of our county home will approximate $1,000,000 per year according to our information, and this is approximately five percent on the assessed valuation of the real property owned by our 55,000 people. This contrasts with the sum of $85,000 per year which we are informed was the cost of similar services when they were handled, and efficiently handled, by our local county commissioners. The population was then approximately what it is now.

Even though we have sympathy for the indignant protests of the good citizens and taxpayers in this county, and though the position taken by the clerk is based upon sound common sense, still this court has no authority to supervise expenditure for relief and must be bound by the statute as it is written by the legislature. The act provides, inter alia, that a license shall not issue "to any male person who is or has been within five years, an inmate of any county asylum or

home for indigent persons, unless it satisfactorily appears that the cause of such condition has been removed, and that such male applicant is physically able to support a family": 48 PS §15. The position taken by the clerk is that the male applicant is unable to support his family. However, inability to support a family is no disqualification under the statute, unless the man has been "within five years an inmate of a county asylum or home for indigent persons, etc." The male applicant has been on relief but not an inmate of a county asylum or home for indigent persons.

It is contended that logic requires the application of the rule which prohibits persons who are or have been within five years inmates of a county asylum or home for indigent persons from obtaining a license unless it satisfactorily appears that the cause of such condition has been removed and that the male applicant is able to support a family to persons who have been or are on relief outside of such homes, because our present laws permit the support of such indigent persons outside of such homes and asylums. We recognize the logic of this contention but will not so hold because such a decision would be judicial legislation. The remedy lies with the legislature.

While the position taken by the clerk manifests a very intelligent approach to a problem which is rapidly growing more serious, still he fell into error in concluding that a moron who has been on public relief is not entitled to a license under the law as it now stands.

### Order

And now, March 21, 1949, the action of the clerk in refusing to issue a license is reversed and the clerk is directed to call the parties before him to determine whether or not they are, in all other respects, entitled to receive a license.